# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ALLEN DEKEYSER and MARQUETA
DEKEYSER,

                              Plaintiffs,

LEON BURNS, CITY OF
MILWAUKEE, and JOSE FLORES,

                              Defendants.

Case No. 24-CV-231-JPS

**ORDER**

## 1.    INTRODUCTION

In March 2022, Plaintiff Allen Dekeyser ("Allen") was shot in the
doorway of his home by police responding to a 911 call. In February 2025,
Allen and Plaintiff Marqueta Dekeyser ("Marqueta") (together, "Plaintiffs")
sued the City of Milwaukee (the "City") and Milwaukee Police Department
("MPD") officer Leon Burns ("Burns") and detective Jose Flores ("Flores")
for alleged violations of Plaintiffs' federal constitutional rights under 42
U.S.C. § 1983, as well as for malicious prosecution. ECF No. 1; ECF No. 23
and Dec. 27, 2024 text order (motion to voluntarily dismiss certain counts
and a previously-named defendant from the action and Court's order
granting the same).[1] Defendants now move for summary judgment on all

---

[1] One of the claims that Plaintiffs agreed to voluntarily dismiss was their
claim against the City under *Monell v. Department of Social Services of the City of New
York*, 436 U.S. 658 (2018). ECF No. 1 at 9–11; ECF No. 23 at 2. Although they did
not also explicitly agree to dismiss the City, it appears that the City must be
dismissed from this action because the *Monell* claim was the only claim that
Plaintiffs brought against it. *See* generally ECF No. 1 (making allegations against

remaining counts. ECF No. 28. The motion for summary judgment is fully briefed. ECF Nos. 29, 32, 33. For the reasons discussed herein, the Court will grant in part and deny in part the motion and set this matter for trial.

## 2. FACTS[2]

### 2.1 Marqueta and Allen

At the time of the events underlying this action, Allen and Marqueta—a married couple—resided together on North 19th Street in Milwaukee, Wisconsin (the "Residence"), which has a motion-sensor Ring doorbell security camera system. ECF No. 30-1 at 8, 9. Allen had previously worked as a trained armed security guard, through which he obtained his concealed carry license and was certified in matters including Private Security Firearms Proficiency and Safe Use of Oleoresin Capsicum and Related Chemical Defense Sprays. At the time of the relevant events, Allen owned a firearm.

### 2.2 Before the Shooting

The events of March 5, 2022 are largely undisputed up until police's interaction with Allen at Plaintiffs' residence (the "Residence") late that evening. Plaintiffs spent the afternoon at Allen's parents' house, where Allen consumed two beers and became worked up during a conversation

---

the City only in the context of the *Monell* claim). The Court will accordingly so order.

[2]The parties submitted a stipulated statement of undisputed facts. ECF No. 26. For purposes of Defendants' motion for summary judgment, the Court will adopt those stipulated facts that are material, with minor, non-substantive edits. Citations to the statement of undisputed facts, and the internal citations therein, are omitted for brevity. The Court occasionally cites to other portions of the record to the extent that they help clarify the events and timeline. The parties also submitted a joint statement of disputed facts, to which the Court cites as necessary. ECF No. 25.

with his parents. Plaintiffs returned to the Residence around 7:00 P.M. and constructed a dining room table together without incident. They later turned on a movie, during which Allen fell asleep.

At approximately 10:00 P.M., Marqueta woke Allen and told him to go to bed, which made Allen mad. Allen went upstairs, and at approximately 11:00 P.M., he told Siri to turn off the lights. Allen's instruction to Siri caused the lights and the television on the first floor, where Marqueta had remained, to turn off. When Marqueta expressed her frustration over this to Allen, he told her that he had turned the lights off because he wanted her to go to bed. He turned the lights back on and went downstairs, frustrated.

Some time later, Marqueta went upstairs. Allen, who remained in the living room, began to smoke marijuana. When he consumed both alcohol and marijuana in the same day, his emotional state would become a "mess." Upstairs, Marqueta asked Siri to turn off the lights, which caused the lights to turn off downstairs where Allen was. This upset Allen further, who yelled to Marqueta, "You wanna fucking play games?"

Allen then went to the basement and turned off the Wi-Fi. Marqueta realized the Wi-Fi had been turned off when the television in the bedroom went blank. According to Marqueta, the Wi-Fi "did not turn on again while [she] was in the house" that evening.

Marqueta went down to the basement and found Allen with pliers in his hands. They verbally argued, and Allen turned off the power to the entire house. He then went over to the outlets and light switches—each of which was connected to the Wi-Fi independently—intending to disengage Alexa and Siri. *See* ECF No. 30-2 at 31–32 (Q: "And in order to disengage Siri and Alexa . . . , you had to remove the wall [outlets and switches]?"

A: "Yeah."). "Allen was unable to remove the [outlets and light switches] . . . because he and Marqueta continued" arguing. Allen then went upstairs, and Marqueta turned the power back on. Marqueta then went upstairs, and the argument continued, with Allen threatening to "remove 'Siri' and 'Alexa' from the wiring of the house."

Marqueta then went up to her bedroom and prepared for bed. Allen entered visibly angry. He grabbed his gun from the bedside table and racked it, loading one bullet into the chamber. He said that he was "sick of this shit" and walked past Marqueta with the gun at his side pointing at the floor. Marqueta feared for her safety, having recognized that Allen was "red zoned."

Allen went down to the basement, where he shut the power to the house back off "with the intent of deconstructing the outlets and light switches to remove 'Siri' from the whole house." Marqueta testified that the power was not on during at least part of her 911 call and that it remained off "while she was in the house" that evening. According to Allen, he also turned the Wi-Fi off at that time.[3] In order to remove Alexa and Siri "from the electrical system," Allen believed he had to "turn off the power . . . and take apart the outlets."

At 11:22 or 11:23 P.M., Marqueta called 911 from the bedroom because she did not feel safe with Allen in the Residence and because she worried for his own safety. *See* ECF No. 30-19 at 1; ECF No. 30, Ex. 20[4]

---

[3]It is not clear how Allen could have turned the Wi-Fi off at this point when Marqueta testified that it was not turned on again after he turned it off the first time. ECF No. 26 at 3. It is also unclear how the Wi-Fi could have remained on even after Allen shut down the power for the entire home. *Id.* at 4.

[4]While parties that file audio and video exhibits will ordinarily file placeholder cover sheets on the docket so that the Court may easily cite to those

(audio recording of 911 call). She told the operator that she had gotten into an argument with Allen, that he had been drinking, that he had cut the power to the house, that he had a gun and was now damaging property, and that she had fled from him. The operator asked Marqueta if Allen could become aggressive towards officers, to which Marqueta responded, "No, I don't know, I don't know. He has anxiety. He has issues. I don't know what he is capable of." After hanging up, Marqueta left the Residence, got into her vehicle, and drove around until she saw an MPD vehicle driving towards her Residence.

### 2.3    The Shooting

At approximately 11:25 P.M., Burns and non-party officer Adam Rusch ("Rusch") were dispatched to the Residence for a subject with a gun. Burns and Rusch arrived on scene at 11:33 P.M. and parked a few doors down. Upon arrival, Burns encountered Marqueta, who informed him that Allen was a former armed security guard and had a gun. Marqueta told Burns how she and Allen had argued, how he had "cut the lights out," and that Allen had gotten his gun out when she confronted him about turning the lights off. She told the officers that she was afraid that Allen was going to hurt himself, and that she also feared for her own safety since Allen had racked the firearm during their argument. She later testified that she wanted the officers to know that Allen had a gun so that they would not shoot him for having the gun.

---

exhibits, Defendants have not done so here. Accordingly, the Court is constrained to refer to the audio and video files by their exhibit numbers as listed in the Declaration of Meghan McCabe. *See* ECF No. 30 at 1–4. All documents are cited herein by their ECF number, disregarding the exhibit number assigned to them in McCabe's Declaration.

Marqueta gave Burns keys to the Residence, and Burns and Rusch approached the Residence. Burns and Rusch used the "contact and cover approach," with Burns as the contact officer and Rusch as the cover and supporting officer. Burns testified that he had no plan about what to do if Allen answered the door holding his gun. Despite having not discussed a plan, Burns and Rusch trusted each other's training.

Burns stood on the porch on the right side of the front door, while Rusch stood along the front side of the Residence. Burns knocked on the door and yelled "Police!"[5] No one responded, and a dog began barking. Burns knocked again and yelled "Police!" to no response. Allen later testified that he did not hear the officers knocking or announcing themselves. ECF No. 30-2 at 45–46.

Using the keys provided to him by Marqueta, Burns unlocked both the glass security door and the front door. He opened both doors and then immediately closed the glass security door after observing a dog approaching. The lights in the front rooms—the living room and dining room—of the Residence were off. The front door remained open, blocking the officers' view of the dining room.

Allen had earlier seen Marqueta leave the Residence after she hung up with 911. After she left, he smoked some more marijuana and then returned to the basement, where he began restoring the power and reconnecting the Wi-Fi. The Ring security system takes 10 to 15 seconds to reboot after reconnecting to the Wi-Fi. Allen believed the Ring system had

_____

[5] Police did not opt to use the doorbell. ECF No. 30, Ex. 15 at 3:35–3:41 (Burns on body cam footage contemplating whether to use the doorbell or just knock and deciding on the latter); ECF No. 30, Ex. 16 at 3:33–3:45 (Rusch body cam footage showing the same).

rebooted and was operational "because of the blue lights on the cameras and base station in the basement."

While in the basement, Allen heard his dog aggressively barking at the front door, which prompted him to go upstairs. He grabbed his firearm and walked to the front door, holding the loaded firearm in his right hand both because of the way his dog was aggressively barking at the front door and because the door was ajar. ECF No. 30-2 at 61. Prior to approaching the door, he did not check the Ring camera app to see who was in front of the Residence. He approached the door from the dining room, approximately ten seconds after Burns had closed the glass security door, and he testified that he could not see who was there as he approached. ECF No. 30-2 at 50.

Burns and Rusch saw that Allen approached with a gun in his right hand pointed down towards the floor. Rusch's rifle and attached flashlight were pointed directly at Allen. The officers began to yell "Hands!" multiple times, their expectation being that Allen would show them his hands.[6] Allen heard these commands. ECF No. 30-2 at 51. Once Allen saw Burns and Rusch, he immediately recognized that they were police officers. ECF No. 30-2 at 72. Allen began to slowly raise his hands from his hips with the gun still in his right hand, and, according to Allen, with "nothing[] on the trigger." ECF No. 30, Ex. 14 at 42:02–42:07. The parties agree that the firearm was never pointed directly at Burns and that it never passed Allen's waistline.

Rusch then yelled "Let me see your hands" and began to open the glass security door. Before it could fully open, Burns fired two shots at Allen

---

[6]Meanwhile, in his deposition, Flores testified that his expected response in that situation would have been for Allen to drop the gun. ECF No. 30-3 at 145–46.

through the glass security door. One bullet struck Allen in the chin, and the other became embedded in the living room wall. Allen later testified that he had been aiming at Allen's head. ECF No. 30-4 at 18. Burns shot Allen within approximately three seconds of the officers saying "Hands," and within approximately one second after Rusch yelled "Let me see your hands." ECF No. 30-2 at 85; ECF No. 30-3 at 144; ECF No. 30, Ex. 15 at 5:18–5:24 (Burns body camera footage). Rusch then entered the Residence to tend to Allen's injuries until paramedics arrived. On the ground, Allen told Rusch, "I didn't know it was you," presumably meaning that he did not realize it was police at the door. ECF No. 30, Ex. 16 at 5:58–6:01. There is no video footage of the shooting itself, because Burns' body-worn camera is blocked by a sign on the front door. *See generally* ECF No. 30, Ex. 15.

The parties dispute the extent to which Allen raised his hands in response to officers' verbal commands. ECF No. 25 at 2. Allen testified that he attempted to comply with officers' command and denies that he ever pointed his firearm at Burns or in his direction. ECF No. 25 at 2; ECF No. 30-2 at 52 ("I slowly started to raise my hands, and then the next thing I know I got shot. . . . I know [my hands] didn't even pass my wayside [sic] . . . . The second anything moved, the cop shot me."); *id.* at 52–53 (Allen testifying that his firearm remained pointed down at the floor while he was at the door). Meanwhile, Burns testified that Allen had begun to point his firearm at him. ECF No. 30-4 at 7 ("[H]e refused to drop the firearm and at one point moved his hand in an upward motion towards my direction . . . ."). He conceded in his deposition that Allen's gun was never actually pointed in his direction and that it had merely "started to come up." *Id.* at 19–20, 132.

The parties also dispute whether Allen racked the firearm at the front door. ECF No. 25 at 1. At his deposition, Burns at first testified that he heard, but did not recall if he saw, Plaintiff rack the slide of his firearm in the doorway. ECF No. 30-4 at 8–9; *see also* ECF No. 30, Ex. 23 at 4:41–4:48 (Burns stating in an internal affairs interview that he only heard Allen rack the firearm). Later in his deposition, however, he testified that he both "heard and . . . saw" Allen rack the slide in the doorway. ECF No. 30-4 at 130. He acknowledged, however, that upon review of the body camera footage from the incident, he could not see Allen rack the slide of his gun. *Id.* at 12. Meanwhile, in a response to a Request to Admit, Rusch admitted that he never heard Allen rack the slide or otherwise chamber a round to his gun. ECF No. 30-28 at 1. At his deposition, Allen maintained that he racked his firearm when he was upstairs in the bedroom with Marqueta, ECF No. 30-2 at 38–39, but that he did not rack it as he later approached the front door, *id.* at 49. However, when he spoke to detectives several days after the shooting, he told them that he *did* rack the firearm when he was at the front door, ECF No. 30, Ex. 14 at 47:59–48:13, and he speculated that the officers at the door may have reacted the way they did because they heard him rack his firearm, *id.* at 54:51–54:57.

The parties also dispute whether Burns had time to deescalate before firing at Allen. ECF No. 25 at 2. Burns testified that he "didn't have any time" to deescalate the situation because "in the time from [Allen] chambering the round and then moving to raise [the gun], there wasn't any time to have a conversation . . . ." ECF No. 30-4 at 130. Meanwhile, Allen maintains that he was shot almost immediately upon attempting to comply with officers' command of "hands." ECF No. 30-2 at 52.

### 2.4 After the Shooting

Allen suffered a bullet wound to the face. The bullet traveled along his jaw line and lodged in his back, fracturing two vertebrae in his spine and causing permanent injury to his right carotid artery.

Marqueta heard the two gunshots and began to approach, crying and asking what happened, but Burns prevented her from returning to the Residence and told Marqueta that Allen was "fine." Around this time, other responding officers arrived on scene. Burns told these officers to "secure" Marqueta. The responding officers told Marqueta that she was not in trouble and tried to calm her down. *See* ECF No. 30, Ex. 17 at 7:22–7:35 (officer Antonio Dorsey body camera footage) (officer asking Marqueta to sit in back seat of squad car so she doesn't pass out; Marqueta protesting because she's "not a criminal;" officer reassuring Marqueta she is not a criminal and not in trouble). They also surrounded her and refused to let her leave the scene or use her phone to contact anyone. ECF No. 30-1 at 47 ("[I]t was four officers standing around me, and I couldn't go towards [the Residence]. I couldn't call on my phone. I couldn't do anything. They kept asking me to get in the back of a squad car."); *id*. at 99–100 (Q: "And one of the officers said, 'We can't let you call anybody'?" A: "Yes." Q: "And, again, you were not free to leave?" A: "No." Q: "In fact, one of the officers physically had his hand on your jacket as you were trying to walk off . . . telling you [that you] couldn't go anywhere?" A: "Yes." (cleaned up)); ECF No. 30, Ex. 17 at 13:05–13:43 (body camera footage showing officer holding Marqueta's arm and telling her that she couldn't "go over" where she was trying to go). The responding officers asked her what her relation was to Allen, whether she was the 911 caller, what her name was and how to spell it, what her address was, what her date of birth was, what prompted her

911 call, what Allen and Marqueta had been arguing about, and what time they had begun arguing, among other questions. ECF No. 30, Ex. 17 at 5:41–5:43, 17:14–17:58, 18:17–20:45. Marqueta was cooperative and ultimately gave six or seven separate statements to various officers.

Upon his arrival, Flores was briefed on the preliminary details of the shooting and was assigned to interview Marqueta. When Flores first approached Marqueta, she was seated in an MPD vehicle with a door open. *See* ECF No. 30-1 at 50 (Marqueta testifying that she only agreed to sit in the back of the squad car if officers kept the door open); *id.* at 104 (Marqueta testifying that she did not believe that she could refuse to get in the vehicle since officers kept surrounding her). At that time, she was accompanied by two other officers.

Flores interviewed Marqueta at approximately 12:49 A.M. on March 6, 2022 in his squad car a block away from the Residence. *See* ECF No. 30, Ex. 7 (recording of interview). During this time, Flores was in the driver's seat and Marqueta was in the front passenger seat. Flores told Marqueta that Allen was alive and talking. Flores asked her many of the same questions that officers had already asked her on scene. *See generally id.* Marqueta again provided a statement of the events of the afternoon and evening of March 5, 2022. In total, their conversation in the vehicle lasted approximately 35 minutes. ECF No. 30, Ex. 7. Marqueta also gave Flores consent to access her phone, including the Ring app, and she told Flores that she didn't care if he looked through it. *Id.* at 28:16–28:20; *but see* ECF No. 30-1 at 52 (Marqueta testifying that she gave Flores consent to search her phone because she "felt like [she] didn't have a choice"). Marqueta asked if she could call Allen's parents before Flores took custody of her

phone, and Flores answered in the negative. ECF No. 30, Ex. 7 at 28:46–29:05.

Police wouldn't let Marqueta call anyone, wouldn't let her see Allen, and wouldn't let her approach the Residence. However, it is undisputed that Flores never told Marqueta that she was not free to leave, that no officer ever indicated to her that she was under arrest, and that Marqueta did not ask Flores whether she could leave. Nevertheless, given the police presence and the fact that she was in a squad car, Marqueta believed that she was not free to leave.

Approximately thirty minutes into their conversation in the squad car, Marqueta told Flores that she had to use the bathroom. ECF No. 30, Ex. 7 at 31:48–31:51. Flores had Marqueta sign a consent to search form before allowing her to use the bathroom, and he told her that in order to use the restroom, she would have to be transported to the police department. Flores asked Marqueta if she was okay with being transported there, and she consented so that she could use the bathroom.

Two other officers then took her to the Police Administration Building. Neither of these officers told Marqueta that she was under arrest or not free to leave. Nevertheless, again, Marqueta felt that she was being detained and did not believe she could refuse to go to the Police Administration Building. Upon arrival, she was allowed to use the restroom, and then officers took her to an interrogation room.

At 2:12 A.M. on March 6, 2022, Flores interviewed Marqueta in the interrogation room. This interview lasted about an hour. ECF No. 30-1 at 110; ECF No. 30-3 at 80. Flores asked Marqueta to tell her what happened "from the top." ECF No. 30, Ex. 6 at 2:23–2:35. The door to the room was open for the entirety of the interview, but where Flores was sitting at least

partially impeded Marqueta's exit. *See generally id.* The room had no windows. ECF No. 30-1 at 110; ECF No. 30-3 at 73–74. At the beginning of the interview, Flores asked Marqueta if she needed anything to eat or drink, told her that Allen was conscious and talking, and told her, "You know you're not in trouble or anything, right? I just wanted to clarify[,] and you are free to leave." At no point during the interview did Flores tell Marqueta that she was not free to leave. Flores, however, did not allow Marqueta to use her phone, and when she asked him if Allen had shot himself, Flores indicated that he did not know. ECF No. 30, Ex. 6 at 39:32–39:45. Marqueta did not learn that Burns shot Allen until she later saw it reported on the news. ECF No. 30-1 at 112.

During the interview, Flores confirmed with Marqueta that the Wi-Fi and power had gone off and on, and she told Flores that she was not sure if the Ring camera system was working at the time of the shooting. Towards the end of the interview, Flores told Marqueta that she "d[idn't] have to stay [t]here forever" and that she would be "released to go back to [her] dogs." After touching base with his superior, Flores returned to the interrogation room and told Marqueta that they were "going to send [her] back" and told her that they were going to hold onto her phone. ECF No. 30, Ex. 6 at 56:08–56:28.

After finishing the interview, Marqueta returned to the squad vehicle so that the two officers that had transported her to the Police Administration Building could return her to the Residence. Within minutes of returning to the squad vehicle, however, Flores informed the two officers that he needed to complete a domestic violence lethality assessment and needed Marqueta to return to the building to answer additional questions. At this point, it was nearly 4 A.M. *See* ECF No. 30, Ex. 8 (beginning of video

timestamped at 3:52 A.M.). Flores had inadvertently forgotten to complete the domestic violence lethality assessment because such forms are not typically completed by homicide detectives such as Flores. The domestic violence lethality assessment was required based on MPD standard operating procedure given the nature of Marqueta's 911 call.

Marqueta agreed to answer Flores' additional questions. She completed the assessment in a windowless interrogation room, *see generally* ECF No. 30, Ex. 8, and the door to the room again remained open. Flores thanked Marqueta for her patience and again asked her if she needed anything. *Id.* at 1:32–1:36. During the assessment, which lasted approximately twenty minutes, *see generally id.*, Marqueta was informed that she was not permitted to have contact with Allen for 72 hours as mandated by state law and MPD standard operating procedure. At the end of the assessment, Marqueta again asked if Allen had shot himself, and Flores indicated that he did not know since he was still "working with" her. ECF No. 30, Ex. 8 at 18:55–19:02. He then told her, "If that's all, I'll let you go with the officers." *Id.* at 19:49–19:52. At no time during the assessment did Flores tell Marqueta that she was not free to leave, and at no time during it did Marqueta ask to leave. Again, Marqueta nevertheless believed that she was not free to leave at that time.

The parties dispute whether Ring camera surveillance videos of the shooting itself ever existed or were deleted by Flores in furtherance of a conspiracy. ECF No. 25 at 2–3. After interviewing Marqueta, Flores maintained the chain of custody of her phone and ultimately delivered it to an officer in the High Technology Unit who examined it. Forensic examination of Marqueta's phone revealed no video from the Ring camera capturing the shooting. Flores testified that he was familiar with the Ring

system and knows how to delete videos from the Ring app, but he denied knowing anything about anyone from MPD deleting videos in this case. ECF No. 30-3 at 48. It is undisputed that Flores had sole custody of Marqueta's phone from the time he took possession of it at the scene at approximately 12:50 A.M. on March 6, 2022 until he handed it over for forensic examination by the High Technology Unit several hours later. Meanwhile, as part of officers' search of the Residence, officers seized the Ring base station out of the basement. ECF No. 30-1 at 78–79.

Although he had received written consent from Marqueta to search her phone, Flores also submitted a preservation request and warrant to Ring on March 8, 2022 requesting that Ring preserve and produce videos from 2:00 P.M. on March 5, 2022 to 12:30 A.M. on March 6, 2022. Ring responded on March 10, 2022, and Flores followed up because the file that Ring produced to MPD appeared to not contain any videos from the period requested in the warrant. On March 14, 2022, a Ring Law Enforcement Response Specialist confirmed that the data disclosed matched the time window outlined in the warrant. In other words, Ring had no videos capturing the shooting that it could produce.

Allen and Marqueta recovered 73 separate videos from the Ring camera during that same time period, however, none of which are identified in Flores' report. There is a 28-minute gap between Ring Living Room Video #1 and Living Room Video #2, between 11:14 P.M. and 11:42 P.M. In other words, Plaintiffs recovered Ring camera video from approximately fifteen minutes before and ten minutes after the shooting. Plaintiffs have not been able to confirm that video of the shooting itself ever existed.

The record is unclear as to whether the Ring camera system would remain operational if the Wi-Fi and power were turned off. Allen testified that the Ring cameras were operational when he went upstairs to see who was at the door, ECF No. 30-2 at 46, 62, but he did not check the Ring camera app on his phone to see who was at the door before he approached, *id.* at 62. Marqueta and Allen both testified that it only took fifteen to twenty seconds for the "electronics and the Wi-Fi to reboot" after the power is reconnected. *Id.* at 46; ECF No. 30-1 at 27.

Marqueta also testified that the Ring security system "continues to protect" the Residence even when the power goes out. *Id.* at 27; *id.* at 61 (Marqueta confirming in deposition that the Ring security system operates independently from both the power and the Wi-Fi). Similarly, Allen testified at his deposition that the Ring camera system remains operational even if both the Wi-Fi and power are out because the cameras have a battery backup and the base station in the basement has its own SIM card for data. ECF No. 30-2 at 9.

Defendants contend that the Ring camera system did not capture the shooting because at the time that officers arrived, Allen was in the basement in the process of restoring power to the house and was interrupted by hearing the dog barking upstairs. ECF No. 25 at 3; ECF No. 30-2 at 43 ("I was monkeying around down there a couple minutes. I screwed everything back in. . . . I think at that point is when I'm flipping all the power, everything is being turned back on at that point."). When asked at his deposition "why there is a 32-minute gap between Living Room Video Number 1 and Living Room Video Number 2," Flores responded: "[Allen] unplugged his camera system[,] and . . . he turned off the entire electricity to the home." ECF No. 30-3 at 47. And when asked whether "disconnecting

Wi-Fi or turning off the power" would turn off the Ring cameras, Flores responded in the affirmative, although he clarified that this was just "a possibility" and that he was "just assuming." *Id.* at 47–48. He later clarified that Ring explained to him in response to his preservation request that any gap in footage could be attributable to "a device becom[ing] inactive based on power" or, alternatively, to "deletion." *Id.* at 132.

After interviewing Marqueta, Flores and the other detectives on the late shift debriefed inside the Police Administration Building during the early morning hours of March 6, 2022. They reviewed body worn camera video and discussed what tasks needed to be completed by the next shift. Until this point, Flores had not reviewed Burns' body worn camera footage.

Meanwhile, Allen was in the hospital, where he remained for several days. *See* ECF No. 30-2 at 65 (Allen testifying that he was released from the hospital on March 8, 2022). At approximately 12:46 A.M. on March 6, 2022, Allen gave a statement to Detective Rachel Smith ("Smith") in the emergency room. Allen told Smith that he didn't understand why he was shot because he was fully cooperating and trying to put his hands up, and because his gun wasn't aimed at anyone.

Sometime later that day, and despite not having interviewed Burns, ECF No. 30-3 at 18, Flores drafted and signed a probable cause statement alleging the following against Allen: (1) Disorderly Conduct with a Domestic Abuse: Act/Create Fear modifier and a While Armed modifier, and (2) Intentionally Pointing a Firearm at Law Enforcement. In the probable cause statement, Flores wrote that Burns claimed to have "observed [Allen] chamber in a round and take a step to the side [and] began to raise the gun toward [Burns]." ECF No. 30-23 at 1. That statement was the sole basis for probable cause for the felony charge of intentionally

pointing a firearm at law enforcement. ECF No. 30-3 at 139; ECF No. 30-24 (listing that charge as a Class H Felony). Flores later testified that he believed that the information in his probable cause statement attributed to Burns came from Detective Michael Gretenhardt ("Gretenhardt"), but that could not have been the case since Gretenhardt did not interview Burns until two days after Flores drafted the statement. The City has not been able to identify who provided the information attributed to Burns in the probable cause statement regarding observing Allen chamber in a round and begin to raise the gun toward Burns. *See* ECF No. 30-22 at 3.

On March 7, 2022, Allen spontaneously stated to police while hospitalized that he didn't think it was police at his door that night. "I am thinking it's a young punk in our neighborhood because we get a lot of that." Meanwhile, a court commissioner, having reviewed the probable cause statement that Flores prepared, found probable cause to charge Allen, including for intentionally pointing a firearm at law enforcement, and set bail at $15,000.

Then, on March 8, 2022 at approximately 6:03 A.M., Allen voluntarily spoke with Detective Travis Jung ("Jung") and Flores. At the beginning of this interaction, which was audio recorded but not video recorded, *see* ECF No. 30, Ex. 14, Allen informed Jung and Flores that he had not taken his pain medication that morning because he knew detectives were coming to interview him. Jung and Flores confirmed that Allen was lucid and not under the influence of any substances.

The detectives read Allen his Miranda rights, which he waived. Allen then provided a statement of the events leading up to and including the shooting. Allen told the detectives that approximately ten to fifteen minutes after Marqueta left the Residence, he heard knocking on the door.

He told them that whoever was knocking did not identify themselves as MPD officers and that if they had, he would have put his gun away before approaching the door. Allen also told the detectives that he racked the slide of his gun as he was standing at the front door to scare any "young punks," but he later testified in his deposition that he was "unsure" why he told the detectives that since he "only racked [the gun] once, and that was in front of Marqueta upstairs." ECF No. 30-2 at 71; *id.* at 75–76 (Allen testifying that it was "a bunch of nonsense" and "shenanigans" that he told detectives that he racked the gun at the door because "there's no way you can double rack a gun" and he "definitely didn't unrack it to rerack it"). He also told the detectives that he never aimed or raised his gun at the police and that it was only ever pointed down and towards the side. He attempted to demonstrate the manner in which he attempted to comply with Burns' and Rusch's "Hands" instruction. However, his demonstration is not entirely clear since the interview was not video recorded. *See* ECF No. 30-3 at 128 (Flores in deposition agreeing that "there wouldn't be an argument about interpretation" of Allen's demonstration during the interview if there had been a video).

During this interaction with detectives, Allen was handcuffed to the hospital bed. He later testified that he told detectives what he thought they wanted to hear so that he could avoid criminal charges and see his family. *See* ECF No. 30-2 at 66 ("I just wanted to get out of there to see my family. They wouldn't let me talk to anybody or see anybody."); *id.* at 75–76 (Allen testifying that he was "telling [the detectives] anything at [that] point" in order to get out of there).

Later that same day, at 2:00 P.M., Gretenhardt interviewed Burns. This interview was neither audio recorded nor videotaped, per MPD policy.

ECF No. 30-3 at 126–27. Burns told Gretenhardt that when Allen walked in front of the door, Burns "immediately observed a firearm in [Allen's] hand" and Allen "then racked the slide of the firearm." ECF No. 30-12 at 4. Burns also told Gretenhardt that Allen then "began to raise the firearm in the direction of" Burns. *Id.*

Approximately seven months later, on October 18, 2022, Burns participated in an internal affairs interview. ECF No. 30, Ex. 23 (recording of Burns' internal affairs interview). Burns stated in that interview that Allen chambered a round in the doorway and "proceeded to point his firearm at [Burns]." *Id.* at 3:40–3:49. In this interview, when asked if he saw Allen rack the firearm or just heard it, Burns responded that he "heard it." *Id.* at 4:41–4:47. Burns stated that he shot once Allen's firearm passed Allen's knee, and that Allen's firearm was never pointed directly at Burns. *Id.* at 5:12–5:21.

### 2.5 The Criminal Case Against Allen

On March 17, 2022, a criminal complaint was entered in Milwaukee County Case No. 22CF1068 against Allen, charging him with, inter alia, intentionally pointing a firearm at a law enforcement officer. *State of Wisconsin v. Allen Jeffrey Dekeyser*, Milwaukee County Circuit Court Case No. 22CF001068 (Mar. 17, 2022) https://wcca.wicourts.gov/caseDetail.html?caseNo=2022CF001068&county No=40&mode=details (last visited May 15, 2025). The complaint stated that "[i]n his statement[,] [Burns] stated that he observed [Allen] chamber a round into the gun" and that Allen "then raised the firearm[,] pointing it in the direction of the officers." ECF No. 30-24 at 2.

A preliminary hearing was held on April 4, 2022, during which Gretenhardt testified. Based on Gretenhardt's testimony, the judge found

cause to believe that Allen had committed a felony, and the case was bound over for trial.

On October 20, 2022, as part of a plea, the state filed an amended information, dismissing the felony offense of Pointing a Firearm at a Law Enforcement Officer. Allen pleaded guilty to two misdemeanor offenses: Endangering Safety by Use of a Dangerous Weapon with a Detectable Amount of a Controlled Substance, and Disorderly Conduct, Use of a Dangerous Weapon. The court sentenced Allen to twelve months in the House of Correction imposed and stayed and fifteen months' probation. He successfully completed his misdemeanor probation.

## 3.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing Fed. R. Civ. P. 56(a) and *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in the nonmovant's favor. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255 and *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 505 (7th Cir. 2010)).

## 4. LAW AND ANALYSIS

### 4.1 Excessive Force

The Court begins with Plaintiffs' claim that Burns used excessive force against Allen in violation of the Fourth Amendment. ECF No. 1 at 5–6. Defendants seek summary judgment on this claim on the ground that Burns' actions were "objectively reasonable." ECF No. 29 at 8–9. For the reasons discussed herein, the Court concludes that Defendants are not entitled to summary judgment on this claim.

"All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment and its 'reasonableness' standard." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 303 (7th Cir. 2011) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). This standard is an objective one, and it "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)); *see also Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) ("[T]he amount of force used bears directly on whether that force was a reasonable response to the situation faced by the officer.").

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. As a general matter, "[i]f [a] suspect threatens [an] officer with a weapon, deadly force may be used." *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018) (citing *Weinmann v. McClone*, 787 F.3d 444, 449–50 (7th Cir. 2015) and *Plakas v. Drinksi*, 19 F.3d 1143, 1146, 1150 (7th Cir. 1994)).

However, "[a]n officer's use of force is unreasonable if in light of all those circumstances at the time of the seizure, the officer used greater force than was reasonably necessary to effectuate the seizure." *Est. of Williams v. Ind. State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015). Courts "must balance the nature of the force used—from lethal through the spectrum of non-lethal options such as flash bang devices, bean bags, pepper spray[,] and tasers—with the governmental interest at stake." *Id.* at 484. "[S]ummary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible [to] different interpretations." *Cyrus*, 624 F.3d at 862 (citing *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009)). This is such a case.

Summary judgment is not appropriate on this claim, in large part because the evidence presents a genuine dispute regarding the extent to which Allen posed an imminent threat to Burns and Rusch. *Graham*, 490 U.S. at 396 (noting as relevant to excessive force analysis "whether the suspect poses an immediate threat to the safety of the officers or others"); *Est. of DiPiazza v. City of Madison*, No. 16-cv-060-wmc, 2017 U.S. Dist. LEXIS 54955, at *19 (W.D. Wis. Apr. 11, 2017) (denying motion for summary judgment on excessive force claim because "the parties *genuinely dispute[d]* material facts relevant to the question whether [the armed, suicidal individual] posed an imminent threat . . . or only a potential threat" and "there [wa]s evidence to support both positions").

"[T]he mere possession of a firearm by a suspect is not enough to permit the use of deadly force," *Mitchell v. City of Decatur*, 528 F. Supp. 3d 904, 915 (C.D. Ill. 2021), and "[h]aving a weapon is not the same thing as threatening to use a weapon." *Est. of Biegert v. Molitor*, 968 F.3d 693, 700 (7th Cir. 2020) (citing *Sanzone*, 884 F.3d at 740). If Allen was actively complying with officers' commands at the time that he was shot, did not point his firearm at officers or anyone else, and did not rack his firearm within earshot of the officers at the front door—i.e., if his version of events is true— then a reasonable juror could find that Burns' nearly immediate use of deadly force was objectively unreasonable.

In his deposition, Burns testified that he shot Allen because Allen "refused to drop the firearm and at one point moved his hand in an upward motion towards [Burns'] direction." ECF No. 30-4 at 7. Similarly, when Burns was interviewed on the afternoon of March 8, Burns stated that he shot Allen because Allen had "a firearm in his hand," Allen "racked the slide of the firearm," and Allen "began to raise his arms in a manner where the firearm was moving in [Burns'] direction." ECF No. 26 at 16–17.

At least part of Burns' version of events is genuinely disputed, and the Court lacks any video evidence from which it could determine whether his version is accurate. *See Scott v. Harris*, 550 U.S. 372, 384 (2007) (noting as relevant to finding that force used was reasonable that "it is clear from the videotape that respondent posed an actual and imminent threat to the lives of" pedestrians, motorists, and officers involved); *see also Gasser v. Village of Pleasant Prairie*, No. 21-2270, 2022 U.S. App. LEXIS 8015, at *5 (7th Cir. Mar. 28, 2022) ("[T]o the extent [plaintiff's] story is 'blatantly contradicted' by the video such that no reasonable jury could believe it, we do not credit h[is] version of events." (quoting *Dockery v. Blackburn*, 911 F.3d 458, 461 (7th Cir.

2018))). The parties agree that Allen's firearm was never pointed directly at Burns and that it never passed Allen's waistline. ECF No. 26 at 8. Allen testified that his finger was not on the trigger, ECF No. 30, Ex. 14 at 42:02–42:07, and Defendants point to nothing in the record to challenge that assertion. Allen testified, and consistently stated in interviews and statements with police after the shooting, that he was actively attempting to comply with officers' commands at the time that he was shot. ECF No. 26 at 8. The parties also agree that, to the extent that Allen moved his arm with the firearm in it, he did so slowly. ECF No. 26 at 8.

The precise degree to which, and the direction in which, Allen began to raise his hands (with gun still in hand) is genuinely disputed, and Allen's "behavior is susceptible [to] different interpretations." *See* ECF No. 25 at 2; *Cyrus*, 624 F.3d at 862. While Burns testified that Allen had begun to move his firearm in Burns' direction, ECF No. 30-4 at 7, Allen testified that he was shot almost the second that he attempted to comply with officers' "Hands" command, ECF No. 30-2 at 52. That dispute precludes summary judgment, because when an individual is "'subdued and [is] complying with the officer's orders,' the officer may [not] use deadly force." *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 987–88 (7th Cir. 2021) (quoting *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009)); *see also Weinmann*, 787 F.3d at 449 (affirming denial of defendant officer's motion to dismiss excessive force claim despite the officer's "insist[ence] that it [wa]s undisputed that he believed his life was in danger because of the way in which [the plaintiff] was holding the gun" because "the way in which [the plaintiff] was holding the gun *[wa]s* disputed"); *Smith v. Finkley*, 10 F.4th 725, 740 (7th Cir. 2021) ("[The officers] point to [the plaintiff's] movements as they approached him . . . as the

reason they shot, but it is an open factual dispute whether [the plaintiff] appeared to be surrendering or continuing to actively resist.").

Whether Allen audibly racked his firearm at the front door such that officers could have objectively perceived the situation as more threatening is also genuinely disputed, and that dispute also supports the Court's conclusion that it cannot grant summary judgment on this claim. Defendants' briefing ignores this dispute, asserting unequivocally that Allen racked the firearm at the door and that this escalated the situation. ECF No. 33 at 2–3. But whether Allen in fact racked his firearm at the front door is a determination for the trier of fact, after weighing the relevant evidence. While Allen at first told police at the hospital that he did so, he later retracted that statement and now maintains that he only ever racked the firearm in the bedroom earlier in the evening. ECF No. 30-2 at 71, 75–76. Burns himself was not entirely consistent on this point, either. At one point in his deposition, he testified that he heard, but did not recall seeing, Allen rack the slide in the doorway. ECF No. 30-4 at 8–9. That statement was consistent with his version of events during his internal affairs interview in October 2022. ECF No. 30, Ex. 23 at 4:41–4:48. Later in his deposition, however, he testified that he both heard *and* saw Allen rack the slide. ECF No. 30-4 at 130. For his own part, Rusch admitted that he never heard or saw Allen rack the slide. ECF No. 30-28 at 1. Confusing matters even further, the probable cause statement that Flores drafted before ever having interviewed Burns stated that Burns observed Allen "chamber in a round" at the door, and to this day no one has been able to identify who told Flores that Burns made any such observation. ECF No. 30-22 at 3.

There are several additional factors that support the Court's conclusion that summary judgment for Defendants is inappropriate as to

this claim. The first is that officers were already on notice that Allen might be armed when they knocked on the door of the Residence such that his answering the door with a firearm in hand was less ground for surprise than if officers hadn't known a firearm was involved at all. Courts analyzing whether a use of force was objectively reasonable consider "the information known to the officer at the time of the encounter." *Mitchell*, 528 F. Supp. 3d at 914 (citing *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020)). The officers in this encounter were on notice that the individual with whom they were about to interact had a firearm. "Officers must act reasonably based on the information they have," *Siler*, 957 F.3d at 759, and the fact that Burns approached the Residence with that knowledge but with "no plan about what to do if Allen answered the door holding his gun" could support a finding that the deadly force used shortly thereafter was unreasonable. ECF No. 26 at 7; *See Est. of Williams*, 797 F.3d at 483 ("The sequence of events leading up to the seizure is relevant because the reasonableness of the seizure is evaluated in light of the totality of the circumstances. . . . The circumstances known by [the officer], or even created by him, inform the determination as to whether the lethal response was an objectively reasonable one." (citing *Deering v. Reich*, 183 F.3d 645, 649–52 (7th Cir. 1999))); *but see Est. of Biegert*, 968 F.3d at 698 (officers' undisputed failure to make a plan for the encounter did not "render[] the officers' subsequent use of force unreasonable").

Courts also consider "the severity of the crime at issue." *Graham*, 490 U.S. at 396. In this case, officers were summoned to the Residence because Plaintiffs had been arguing, Allen racked his firearm in front of Marqueta, and Marqueta feared both for her own and for Allen's safety. Although certainly serious, this was not a situation in which officers were "aware of

any actual violence" or explicit threat of violence, and "[n]o shots had been fired." *Mitchell*, 528 F. Supp. 3d at 914. Nor was there any indication that Plaintiff "was about to escape." *Id.* at 915 (citing *Siler*, 957 F.3d at 759). Further, officers were not aware of any history of violence on Allen's part. *Compare id.* (noting that the officer "had no knowledge of any violent propensities [the plaintiff] might have had" at the time of their encounter) *with De Luna v. City of Rockford*, No. 00 C 50040, 2004 U.S. Dist. LEXIS 25292, at *3–4 (N.D. Ill. Dec. 13, 2004) (concluding on summary judgment that force used was reasonable where the officer "responded to a 911 call related to a domestic disturbance involving a suspect who he knew to have battered plaintiff before, that he knew had possessed firearms in the past, [and] that acted violently in police custody before").

It is also relevant that the officers never issued any warning that they would use deadly force. *Strand v. Minchuk*, 910 F.3d 909, 915 (7th Cir. 2018) ("Wherever 'feasible,' . . . the officer should give a warning before deploying deadly force." (quoting *Garner*, 471 U.S. at 12)); *see also Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 23 (1st Cir. 2005) (refusing to disturb jury verdict that officer violated Fourth Amendment when evidence supported that he fired "extraordinarily quickly" and without "adequate warning" at armed man whose gun was "pointed downwards"). Whether issuing such a warning would have been feasible in this case is not clear given the extremely compressed timeline of the interaction between Allen and Burns and the differing perceptions of what occurred during that interaction. *See Mitchell*, 528 F. Supp. 3d at 914 (noting that "the duration of the encounter" is a relevant factor in the excessive force analysis (citing *Siler*, 957 F.3d at 759)).

It is also relevant that Burns testified in his deposition that he shot Allen because Allen "refused to drop the firearm," ECF No. 30-4 at 7, but the officers in this case never explicitly ordered Allen to drop his weapon. Burns and Rusch's expectation was that Allen would show them his hands, ECF No. 26 at 7 and ECF No. 30-4 at 16, but the record does not suggest that Allen's hands were obscured. To the contrary, Burns confirmed in his deposition that he gave the command "Hands" "after [having] made the observation that [Allen] had a gun in his hand." ECF No. 30-4 at 16. In other words, Allen's hands were already visible. Defendants assert that "[a] subject raising their hands while holding a firearm is hardly complying with an officers' command to show your hands," ECF No. 33 at 4, but they cite to no authority in support of that assertion, and the Court cannot necessarily agree that a bare command of "Hands" to someone whose hands are already visible would be clearly understood to include an implicit order to also drop any weapons.

Lastly, the fact that officers outnumbered Allen, and knew or had reason to know that they would outnumber him at the time that they knocked on the door, could further support a finding that Burns' near immediate use of deadly force was not reasonable. *C.f. Horton v. Pobjecky*, 883 F.3d 941, 951 (7th Cir. 2018) (affirming finding that force used in shooting was reasonable in part because the officer "was out-numbered by the assailants").

The Court fully acknowledges "that several facts from the encounter do favor a finding of reasonableness." *Mitchell*, 528 F. Supp. 3d at 916. When the 911 operator asked Marqueta if Allen could become aggressive towards officers, Marqueta did not give a particularly reassuring response, stating

that she "d[idn't] know what he [wa]s capable of." ECF No. 26 at 5.[7] The fact that Burns and Rusch announced themselves as police when they knocked on the door, ECF No. 26 at 7, also supports a finding of reasonableness, since officers may be "safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) (citing *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996)); *see also Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) ("Whenever possible under the circumstances, the officer should try to identify himself as a law enforcement officer to the suspect." (citing *Garner*, 471 U.S. at 11–12 and *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (en banc))). Moreover, this is not a case in which Allen's firearm remained, for example, in his waistband or in a holster for the duration of the encounter. *Mitchell*, 528 F. Supp. 3d at 915 (finding that the fact that the plaintiff "never held the gun" "nor . . . ma[d]e any move to take the gun out of his waistband" supported conclusion that use of force was unreasonable).

All that said, this case is distinguishable from those in which courts concluded on summary judgment that an officer-involved shooting of a suicidal or agitated individual was reasonable. For example, in *Sanzone*, the Seventh Circuit remanded a case with instructions for the district court to enter judgment for the defendant officer on the excessive force claim where the "visibly agitated" suspect explicitly threatened "that he would 'fire a warning shot,' and then raised his arm, gun in hand." 884 F.3d at 740–41. In

---

[7] It is not clear, however, whether the officers were aware of that response when they interacted with Allen. *See* ECF No. 30-10 (911 call entry making no mention of Marqueta's statement that she didn't know what Allen was capable of). If Burns and Rusch weren't aware of that response, then they had no information as to how Allen might interact with them as law enforcement officers.

*Estate of Rudy Escobedo v. Martin*, the Seventh Circuit affirmed a grant of summary judgment on an excessive force claim to officers who shot a suspect after an officer ordered the suspect multiple times to drop his firearm and the suspect "began to lower his gun 'towards [the officer], pointing it at [the officer].'" 702 F.3d 388, 409 (7th Cir. 2012). And in *Bell v. Crow*, a case in which officers responded to a residence relating to a domestic disturbance in which the suspect's wife had sought safety at a neighbor's, the Seventh Circuit affirmed a finding of no excessive force where officers shot with beanbag rounds the intoxicated, suicidal suspect who threw knives in the direction of police, told police he would kill any who entered, threatened to blow up his home, and began to attempt to do so. 321 F.3d 637, 638–41 (7th Cir. 2003). Unlike the suspects in those cases, Allen did not explicitly threaten to use his weapon, either at Marqueta or anyone else, was never explicitly told to drop his firearm, and never pointed his weapon directly at the officers.

At bottom, this is not a case in which "it is clear from the [record] that [the defendant] posed an actual and imminent threat to the lives of any[one] who might have been present . . . and to the officers involved." *Scott*, 550 U.S. at 384 (affirming grant of summary judgment to officer on excessive force claim). Allen "ha[d] a constitutional right not to be shot on sight if he did not put anyone else in imminent danger," *Weinmann*, 787 F.3d at 448, and it remains genuinely disputed whether Allen posed such a threat at the time that he was shot. Viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, the Court cannot declare that Burns is entitled to judgment on this claim as a matter of law. Defendants' motion for summary judgment is accordingly denied as to this claim.

The Court next addresses Defendants' argument that Burns is entitled to qualified immunity. ECF No. 29 at 19–21.[8] In evaluating a claim of entitlement to qualified immunity, courts "undertake the twofold inquiry of asking whether [the defendant's] conduct violated a constitutional right, and whether that right was clearly established at the time of the alleged violation." *Strand*, 910 F.3d at 914 (citing *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). Courts "are free to choose which prong to address first." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). With respect to the second prong, "'[c]learly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *Wesby*, 583 U.S. at 63 (cleaned up) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Critically, "a dispute of fact regarding the circumstances surrounding an officer's use of force may prevent [the court] from determining whether an individual's clearly established rights have been violated." *Strand*, 910 F.3d at 918 (citing *Weinmann*, 787 F.3d at 451). A grant of qualified immunity on summary judgment is inappropriate if "[u]nder one version of the facts, the officer's use of force would have been reasonable [and] under another, clearly established law would have made it unreasonable." *Id.* (citing *Weinmann*, 787 F.3d at 449–50). Such is the case here; "[t]he existence of . . . substantial factual dispute[s] about the circumstances . . . surrounding [Burns'] decision to shoot [Allen] preclude[]

---

[8]As the Court notes *infra* Section 4.2.4, the parties failed to appropriately brief the issue of qualified immunity. However, because genuine disputes of material fact relevant to the excessive force claim clearly preclude a finding of qualified immunity as to that claim, the Court proceeds to conclude the same, notwithstanding the parties' deficient briefing.

Case 2:24-cv-00231-JPS    Filed 05/15/25    Page 32 of 58    Document 37

a ruling on qualified immunity at this point." *Id.*; *see also Sledd v. Lindsay*, 102 F.3d 282, 287–88 (7th Cir. 1996) (reversing grant of qualified immunity because there were numerous disputed questions of material fact and no video footage by which to resolve them on summary judgment); *Smith*, 10 F.4th at 742 ("Before the officers' legal argument for qualified immunity can be decided, these factual disputes as to how much of a threat [the plaintiff] posed . . . must be resolved.").

In light of the foregoing, the Court concludes that genuine disputes of material fact preclude it from deciding at this juncture whether Burns is entitled to qualified immunity on Plaintiffs' excessive force claim. "This is not to foreclose the availability of qualified immunity to [Burns] at trial." *Strand*, 910 F.3d at 918. "At trial a jury may resolve these disputed facts in [Burns'] favor, and the . . . [C]ourt could then determine he is entitled to qualified immunity as [a] matter of law." *Id.* at 918–19 (citing *Warlick v. Cross*, 969 F.2d 303, 305 (7th Cir. 1992)).

### 4.2 Unlawful Detention of Marqueta

The Court next addresses Defendants' motion for summary judgment as to Plaintiffs' claim that Flores unlawfully detained Marqueta. ECF No. 29 at 9–13; ECF No. 32 at 7 ("Plaintiffs . . . allege[] that Marqueta was unlawfully detained for hours by . . . Flores as police attempted to construct false felony charges against her husband.").

"The Fourth Amendment protects an individual's right to be free from unreasonable seizures of h[er] person." *Day v. Wooten*, 947 F.3d 453, 460 (7th Cir. 2020) (citing U.S. CONST. AMEND. IV). To prevail on such a claim, Plaintiffs "must establish that [Flores'] conduct constituted a seizure and that the seizure was unreasonable." *Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009) (citing *Bielanski v. County of Kane*, 550 F.3d 632, 637

(7th Cir. 2008)). The first question, therefore, is whether Flores seized Marqueta. *See Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010) ("Any Fourth Amendment inquiry necessarily begins with a determination of whether a . . . seizure actually occurred." (citing *Scott*, 550 U.S. at 381 and *Leaf v. Shelnutt*, 400 F.3d 1070, 1089 (7th Cir. 2005))).

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "[A] person has been seized 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to leave.'" *Bentz*, 577 F.3d at 779 (internal quotation marks omitted) (quoting *Tom v. Voida*, 963 F.2d 952, 956–57 (7th Cir. 1992)). "So long as a reasonable person would feel free 'to disregard the police and go about h[er] business,' . . . the encounter is consensual," and there has been no seizure for Fourth Amendment purposes. *Bostick*, 501 U.S. at 434 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).

"Determining whether a seizure has occurred is a highly fact-bound inquiry . . . ." *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008). The standard is also an objective one; "the mere fact that [the plaintiff] did not feel free to leave . . . does not mean that the police seized h[er]." *Bostick*, 501 U.S. at 436. The following factors are relevant:

> whether the encounter took place in a public place or whether police removed the person to another location; whether the police told the person [s]he was not under arrest and was free to leave; whether the police informed the person that [s]he was suspected of a crime or the target of an investigation; whether the person was deprived of identification or other documents without which [s]he could not leave . . . ; and whether there was any limitation of the person's movement

such as physical touching, display of a weapon, or other coercive conduct on the part of the police that indicates cooperation is required.

*Tyler,* 512 F.3d at 410 (citing *United States v. McCarthur*, 6 F.3d 1270, 1275–76 (7th Cir. 1993)). "Circumstances that might indicate a seizure include the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice (indicating that compliance with the officers' request might be compelled), and the location in which the encounter takes place." *United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) and *United States v. Scheets*, 188 F.3d 829, 836–37 (7th Cir. 1999)). "[W]hether a person asks permission to leave" is also a relevant factor. *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010).

Defendants contend that Marqueta was never in police custody and that even if she was, such detention was lawful. ECF No. 29 at 11. They emphasize that Flores never told Marqueta that she could not leave, that Marqueta never asked Flores if she could leave, and that Flores eventually explicitly told Marqueta that she was not in trouble and that she was free to leave. *Id.* at 10.

The Court finds it prudent to divide its analysis on this point into three sections: one for the alleged on-scene detention prior to Flores' arrival, one for the alleged detention in Flores' vehicle up to the point that Marqueta asked to use the restroom; and one for the alleged detention thereafter, including at the police building.

### 4.2.1 Initial, On-Scene Detention

Plaintiffs argue that Marqueta was unreasonably seized in violation of the Fourth Amendment when, on-scene shortly after the shooting,

Case 2:24-cv-00231-JPS    Filed 05/15/25    Page 35 of 58    Document 37

officers were instructed to "secure her," physically surrounded her, and refused to let her leave the scene or use her phone. ECF No. 32 at 7–9. The problem with this portion of Plaintiffs' Fourth Amendment claim, however, is that Plaintiffs have not attributed this allegedly wrongful conduct to any named defendant. Plaintiffs take issue with this on-scene alleged seizure, ECF No. 32 at 7, but they do not clarify who should be held responsible for it. Their complaint references only Flores regarding their unlawful detention claim, ECF No. 1 at 6, but Flores was not even on scene during this initial, on-scene alleged seizure. To the extent that Plaintiffs may have intended to attribute this alleged on-scene wrongdoing to a not-yet-named defendant, they cannot do so. *See Colbert v. City of Chicago,* 851 F.3d 649, 656 (7th Cir. 2017) ("[A] party may n[ot] amend its pleadings by argument in opposition to summary judgment . . . .'" (quoting *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014)). Accordingly, this aspect of Marqueta's unreasonable seizure claim cannot proceed.

### 4.2.2 Interview in the Squad Car

The Court next turns to the alleged seizure of Marqueta by Flores when he interviewed her in a police vehicle. Given the totality of the circumstances and viewing the evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that Marqueta was seized when Flores interviewed her for approximately 35 minutes in the squad car. There are certainly various factors that support the conclusion that Marqueta was not seized at this time, including the facts that the conversation was one-on-one rather than with multiple officers, *see Clements*, 522 F.3d at 794 (noting that "the threatening presence of several officers" may indicate a seizure (citations omitted)), and that Flores never used "forceful language," *id.*

However, there is also evidence that supports a finding that Marqueta was seized at this time. The fact that the interview took place in a confined, enclosed squad car rather than in an open, public place supports such a finding. *Id.* (noting that "the location in which the encounter takes place" is relevant to determining whether a reasonable person would believe that she was free to disregard the police and go about her business (citations omitted)). The fact that Flores disallowed Marqueta from calling Allen's parents using her own phone could also have suggested to her that she was not simply free to disregard Flores and go about her own business. Moreover, "[i]t was the middle of the night," and police continued to prohibit Marqueta from returning to the Residence, even though over an hour had passed since the shooting. *See United States v. Jerez,* 108 F.3d 684, 690 (7th Cir. 1997) (finding that a Fourth Amendment seizure occurred in part because it was the middle of the night and emphasizing that the "time of the encounter" is a significant factor). Lastly, Flores never explicitly told her during this time that she was free to leave. *Tyler*, 512 F.3d at 410 (noting that "whether the police told the person [that] [s]he was not under arrest and was free to leave" is a relevant factor in determining whether the person has been seized) (citation omitted)). Considering all these factors, a reasonable jury could conclude that a reasonable person in Marqueta's shoes at that time could have believed that she was not free to terminate the encounter with Flores, and therefore that a seizure occurred.

The next question, therefore, is whether such a seizure was reasonable. *Bentz*, 577 F.3d at 779 (citing *Bielanski*, 550 F.3d at 637). Viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, a reasonable jury could conclude that it was not. Although the duration of the interview was not exceedingly

long, lasting 35 minutes, a reasonable jury could find that it was far longer than it needed to be since Flores asked Marqueta to answer questions that she had already answered multiple times on scene and to provide a statement of the night's events that she had already provided to police several times over. *See generally* ECF No. 30, Exs. 7, 17; *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified . . . can become unlawful if it is prolonged beyond the time reasonably required to complete [its] mission."); *Leaf*, 400 F.3d at 1092 (concluding that "any seizure that might have occurred" was not unreasonable in part because it "did not last any longer than reasonably necessary"). A jury could also find that it was not reasonable to prohibit Marqueta from using her own phone to call Allen's parents to alert them that he had been shot, since there is no indication that allowing her to do so would have interfered in any material way with police's investigative tasks or prevented Flores from gathering remaining information that he needed from Marqueta. *Caballes*, 543 U.S. at 407 ("[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.").

The Court similarly concludes that a reasonable jury could conclude that Flores continued to seize Marqueta when he had her sign a consent to search form before entertaining her request to use the bathroom and when he told her that she had to be transported to the Police Administration Building in order to use the bathroom. *See Kirchner v. Thomas*, No. 13 C 1299, 2014 U.S. Dist. LEXIS 166791, at *10 (N.D. Ill. Dec. 2, 2014) ("Kirchner learned that she could not drive to the courthouse herself but had to be brought in the back seat of a police vehicle—hardly the stuff of voluntary cooperation." (citing *Dunaway v. New York*, 442 U.S. 200, 212 (1979)));

*Kernats v. O'Sullivan*, 35 F.3d 1171, 1177–78 (7th Cir. 1994) (noting that "prolonged retention of a person's personal effects or a request by an officer to accompany him to the police station or a police room" are relevant considerations in determining whether a person has been seized). Although Flores did not "deprive [Marqueta] of identification or other documents without which [s]he could not leave," *Tyler*, 512 F.3d at 410, he did condition her ability to use the restroom on her turning over her phone and formally consenting in writing to him searching it, which could be deemed coercive. *See Kernats*, 35 F.4th at 1178 ("[C]oercive . . . police behavior tends to support a belief that compliance is compelled." (citing *Cassady v. Tackett*, 938 F.2d 693, 696 (6th Cir. 1991))).

A reasonable jury could also find the continued seizure unreasonable because it is not clear why Marqueta had to use the restroom at the Police Administration Building as opposed to, for example, at a neighbor's residence or a closer public facility, if not her own Residence. Again, by this point the scene had been secured for over an hour. A reasonable jury could similarly find it unreasonable for Flores to have conditioned Marqueta's opportunity to use the restroom on signing a consent to search form and being transported to the police building, particularly since Marqueta had been consistently cooperative and had given no indication that she would not continue to cooperate. "Police are not directors on a film set, nor are they puppeteers behind a curtain." *Robinson v. Sweeney*, No. 19-cv-0356-bhl, 2022 U.S. Dist. LEXIS 56408, at *17 (E.D. Wis. Mar. 29, 2022) (citation omitted). Ensuring Marqueta's continued participation by putting strings on her ability to use the restroom could be deemed unreasonable, especially since Marqueta had been cooperative and non-evasive, had given no less than five statements to police at this point,

and was not suspected of any wrongdoing. *See Walker v. City of Orem,* 451 F.3d 1139, 1148 (10th Cir. 2006) ("[P]olice have less authority to detain those who have witnessed a crime for investigatory purposes than to detain criminal suspects." (citation omitted)); s*ee also Lincoln v. Scott,* 887 F.3d 190, 196–97 (5th Cir. 2018) (concluding that a woman who witnessed an officer-involved-shooting was unreasonably seized when police "removed [her] from the scene[ and] placed [her] in a cop car" even though police "never told [her that] she had to stay there," and that police continued to unreasonably seize her when they "extended the seizure" by interviewing her at the police station for an additional two hours).

### 4.2.3   At the Police Administration Building

The Court next addresses whether a reasonable jury could conclude that Marqueta was seized during her interview and subsequent domestic violence lethality assessment with Flores in the interrogation room, concluding in the affirmative.



ECF No. 30, Ex. 6 at 00:05 (the interrogation room).

Several factors support a finding that Flores did not seize Marqueta during this time. Flores explicitly told her that she was not in trouble and

was free to go. The door to the interrogation room remained open. Flores used no threatening or hostile language, did not speak with an authoritative tone of voice, and did not touch Marqueta.

However, there is also evidence that supports the conclusion that Flores continued to seize Marqueta during this time. Police "removed [her] to another location" in a squad car, then got her back in the squad car, only to bring her back to the interrogation room. *Tyler*, 512 F.3d at 410 (citation omitted). Police transported Marqueta to the Police Administration Building in a police vehicle even though she had access to her own personal vehicle on scene. Flores interviewed her in a relatively small, windowless interrogation room in the police administration building, and at least partially blocked her exit by sitting in the pathway to the door rather than across from her at the table, and he continued to refuse to allow her to use her phone. *See Dunaway*, 442 U.S. at 212 (finding as relevant to conclusion that a seizure occurred the facts that the petitioner was "taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room"). And although he informed her that she was not in trouble and was free to leave, he presented no avenue by which she could get home after having been transported to the police building in a squad car in the middle of the night. *See Kernats*, 35 F.3d at 1180 (noting as relevant to finding of seizure that the plaintiff "was . . . confined to a small space with no viable means of otherwise terminating the encounter"). Furthermore, his later statement that she would be "released . . . to go back to her dogs" and that he would "let [her] go with the officers"—ECF No. 30, Ex. 6 at 41:31–41:37; ECF No. 30, Ex. 8 at 19:49–19:52—could suggest that Flores was the one deciding when she would leave such that she could not, in fact, get up and leave whenever she wanted. In light of the foregoing, a

reasonable jury could conclude that Flores seized Marqueta when he interviewed her at the police administration building.

A reasonable jury could also conclude that this seizure was unreasonable. A jury could reasonably conclude that the continued seizure at this point was "prolonged beyond the time reasonably required" since Marqueta had already spoken to Flores for 35 minutes in a squad car, provided statements on scene, and turned over her cell phone and consented to its search. *Caballes*, 543 U.S. at 407; *Albert v. City of New York*, 17-cv-3957-ARR-SMG, 2019 U.S. Dist. LEXIS 136428, at *16–17 (E.D.N.Y. Aug. 13, 2019) (denying motion to dismiss Fourth Amendment unreasonable seizure claim where plaintiffs alleged that they were transported to the police station to be interviewed after having witnessed a shooting even though they were not themselves suspected of criminality and "had already been questioned on the scene"). There is no indication why Marqueta, who was not suspected of wrongdoing and who had already repeatedly given statements to police, had to be interviewed further, in the middle of the night, in an interrogation room at the Police Administration Building. There was no exigency to speak of at this point, and it is unclear whether the domestic violence lethality assessment had to be done at that specific time. *Robinson*, 2022 U.S. Dist. LEXIS 56408, at *18 (noting that a temporary investigatory detention must be supported by "some exigent, legitimate law enforcement purpose" (citation omitted)); *Walker*, 451 F.3d at 1149 ("There is no indication . . . that any exigencies were present . . . , justifying the lengthy detention involved here for investigative purposes."); *c.f. Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 688 (9th Cir. 2023) (concluding that police had "limited authority to briefly detain and question the [plaintiffs]" notwithstanding a lack of reasonable

suspicion of criminality on their part "due primarily to the exigencies inherent in preventing an imminent school shooting" and where police "knew the [plaintiffs] had information crucial to stopping" the school shooting). Any public interest in continuing to interview Marqueta at this point was minimal at best; there was no dangerous criminal at large or ongoing threat to anyone. To the extent that police considered Marqueta a victim of domestic abuse, they could rest assured that her alleged abuser was under police supervision at the hospital, going nowhere soon. *C.f. Illinois v. Lidster,* 540 U.S. 419, 427 (2004) (concluding that temporary checkpoint stop was reasonable in part because "the stop's objective was to help find the perpetrator of a specific and known crime" and "[t]he relevant public concern was grave"); *see also Maxwell v. County of San Diego*, 708 F.3d 1075, 1084 (9th Cir. 2013) ("[I]n the hierarchy of state interests justifying detention, the interest in detaining witnesses for information is of relatively low value.").

### 4.2.4   Qualified Immunity

Having concluded that a reasonable juror could find that Flores violated Marqueta's Fourth Amendment rights against unreasonable seizures, the Court next considers whether Flores is entitled to qualified immunity as to this claim. The Court notes at the outset that both parties failed to properly brief the issue of qualified immunity. The Seventh Circuit's qualified immunity cases "demonstrate a painstaking commitment to an *individualized* qualified-immunity analysis," *Est. of Williams v. Cline*, 902 F.3d 643, 651 (7th Cir. 2018) (emphasis added) (citing *Petties v. Carter*, 836 F.3d 722, 731–33 (7th Cir. 2016) (en banc) and *Est. of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997)), but Defendants' invocation of qualified immunity is generalized and

boilerplate. ECF No. 29 at 19–21; ECF No. 33 at 13–15. In their opening brief, they assert broadly, without analysis as to the specific claims brought against them, that they are entitled to qualified immunity but cite to no caselaw in which a court found police entitled to qualified immunity in circumstances like those presented in this case. *See Mabes v. Thompson*, Nos. 24-1048 and 24-1082, 2025 U.S. App. LEXIS 10047, at *13 (7th Cir. Apr. 28, 2025) (qualified immunity analysis must proceed claim-by-claim (citing *Cline*, 902 F.3d at 651)). The Court would accordingly be within its right to conclude that Defendants failed to properly invoke qualified immunity.

Plaintiffs' response does not clarify matters. Their response to the qualified immunity argument focuses almost exclusively on its application to the excessive force claim. ECF No. 32 at 15–16. Despite the lack of appropriate guidance from the parties on the matter, the Court proceeds in determining whether Flores is entitled to a grant of qualified immunity on summary judgment as to this claim.

The second prong of the qualified immunity analysis asks whether Marqueta's right to be free from the specific type of constitutional violation alleged "was clearly established at the time of the alleged violation." *Strand*, 910 F.3d at 914 (citation omitted). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that *what he is doing* violates that right.'" *Day*, 947 F.3d at 460 (emphasis in original) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)); *Thompson v. Cope*, 900 F.3d 414, 421 (7th Cir. 2018) ("[T]he issue is whether the state of the law at the time of a defendant's actions would have given the defendant 'fair warning' that h[is] conduct was unconstitutional." (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002))).

"To defeat qualified immunity, however, the right must be defined more specifically than simply the general right to be free from unreasonable seizure." *Day*, 947 F.3d at 461. "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal bracketing omitted) (quoting *Mullenix*, 577 U.S. at 12). That said, "a case directly on point is not required." *Cope*, 900 F.3d at 421 (citing *Hope*, 536 U.S. at 741). Additionally, "[i]n ascertaining whether a particular right has been 'clearly established' . . . , [the Seventh Circuit] has not required binding precedent from the Supreme Court or the Seventh Circuit." *Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir. 1994) (citing *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)).

Flores is not entitled to qualified immunity with respect to Marqueta's alleged unlawful detention. By March 2022, it was "clearly established that a person cannot be detained for a prolonged period merely due to their presence at a crime scene." *Yang v. City of Minneapolis*, 607 F. Supp. 3d 880, 896 (D. Minn. 2022) (citing *Seymour v. City of Des Moines*, 519 F.3d 790, 797–98 (8th Cir. 2008) (holding that detaining father without reasonable suspicion of criminality on his part for 45 minutes and preventing him from going to hospital where his child was hospitalized violated the father's right to be free from unreasonable seizures)); *see also Walker*, 451 F.3d at 1149 (90-minute detention of witnesses to a shooting was unreasonable); *Maxwell*, 708 F.3d at 1084 ("[T]he Sheriff's officers were on notice that they could not detain, separate, and interrogate the [plaintiffs] for hours" after the plaintiffs' daughter was shot by police); *Lincoln v.*

*Turner*, 874 F.3d 833, 845 (5th Cir. 2017) (noting that, as of 2017, "two circuits agree that detaining police cannot detain a person for a significant period of time solely because she witnessed a police shooting" (citing *Walker*, 451 F.3d at 1149–50 and *Maxwell*, 708 F.3d at 1083)); *Cortez v. McCauley*, 478 F.3d 1108, 1131–32 (10th Cir. 2007) (en banc) (detaining non-suspect witness for one hour in the middle of the night in squad car is unreasonable).

For all these reasons, the Court will deny Defendants' motion for summary judgment as to Marqueta's unlawful detention claim.

### 4.3 Fourth Amendment "Deprivation of Liberty"

Plaintiffs also proceed on a claim that Burns deprived Allen of his liberty and caused his incarceration by fabricating evidence—specifically, by falsely claiming that Allen pointed, or had started to point, his firearm at Burns. ECF No. 1 at 6–7, ECF No. 32 at 9–10.

The parties' briefing on this claim is again severely deficient. Defendants incorrectly assert that both "pre[-] and post-trial deprivations of liberty occasioned by fabricated evidence give rise to a due process claim . . . ." ECF No. 29 at 13 (citing *Saunders-El v. Rohde*, 778 F.3d 556, 561 (7th Cir. 2015)). But "[a] claim for false arrest or pretrial detention based on fabricated evidence sounds in the Fourth Amendment right to be free from seizure without probable cause," not in due process. *Patrick v. City of Chicago*, 974 F.3d 824, 834 (7th Cir. 2020) (citing *Lewis v. City of Chicago*, 914 F.3d 472, 476–78 (7th Cir. 2019)); *see also Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017) ("If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment."). Only "once a trial has occurred" does "the Fourth Amendment drop[] out" and the Due Process Clause come into play. *Jones v. York*, 34 F.4th 550, 564 (7th Cir. 2022) (quoting

*Manuel*, 580 U.S. at 369 n.8). Indeed, the Fourth Amendment is that which Plaintiffs identified in their complaint at the outset. ECF No. 1 at 6 ("Fourth Amendment Claim for Deprivation of Liberty").

This error on Defendants' part permeates the remainder of their briefing of this claim; they go on to recite the elements of a due process evidence fabrication claim, including that "the evidence was used at [the plaintiff's] criminal trial," ECF No. 29 at 13 (citing *Patrick*, 974 F.3d at 835), which is obviously not applicable in a case such as this in which there was never any trial on the charge at issue because it was dismissed. *See* ECF No. 26 at 18 (noting that in October 2022, "as part of a plea, an amended information was filed and Count 1, the felony offense of Pointing a Firearm at a Law Enforcement Officer, was dismissed").

In opposition, Plaintiffs do not acknowledge the error. If anything, they compound the confusion by citing to just a single case, ostensibly in support of the proposition that "[f]abricated or falsified evidence will *always* violate the accused's constitutional rights." ECF No. 32 at 9 (emphasis in original) (citing *Avery v. City of Milwaukee*, 847 F.3d 433, 441–42 (7th Cir. 2017)). *Avery* makes no such unequivocal statement, let alone in the pages that Plaintiffs cite. It says, instead, that "*convictions* premised on deliberately falsified evidence will always violate the defendant's right to due process." *Avery*, 847 F.3d at 439 (emphasis added). Plaintiffs' version omits several critical words and misstates the law in the process. It also seems to acquiesce to Defendants' error in the law, as *Avery* concerns only a Fourteenth Amendment due process violation for fabricated evidence allegedly leading to a wrongful conviction, which is not at issue here. *See generally id.*

The Court nevertheless endeavors to set forth the appropriate legal standard where the parties failed to do so. "The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause." *Manuel*, 580 U.S. at 367. "Arrest and detention are seizures under the Fourth Amendment and therefore must be justified by probable cause for their entire duration." *Crowder v. Barrett*, No. 22-1899, 2023 U.S. App. LEXIS 10461, at *10 (7th Cir. Apr. 28, 2023) (citing *Lewis*, 914 F.3d at 476–77).

"The existence of probable cause is a defense" to this claim, and "a rebuttable presumption of probable cause arises after a judicial determination of probable cause." *Washington v. City of Chicago*, 98 F.4th 860, 863 (7th Cir. 2024) (first citing *Young v. City of Chicago*, 987 F.3d 641, 646 (7th Cir. 2021) then citing *Lewis*, 914 F.3d at 477). There was a judicial determination of probable cause in Allen's underlying criminal case. ECF No. 26 at 17. However, that does not doom this claim.

In some cases, "Fourth Amendment claims for unlawful pretrial detention can survive a judicial determination of probable cause." *Washington*, 98 F.4th at 863. Such claims survive, for example, "if the legal process itself went wrong, such as when the [judicial] determination 'is predicated solely on a police officer's false statements.'" *Crowder*, 2023 U.S. App. LEXIS 10461, at *10 (quoting *Manuel*, 580 U.S. at 367). That is what Plaintiffs allege here. Accordingly, the fact that a court commissioner found probable cause in the criminal case against Allen does not render Plaintiffs' claim subject to dismissal because the parties agree that the probable cause determination was predicated solely on Burns' allegedly false statements. *See* ECF No. 26 at 17. In such a case, "[l]egal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause

requirement. And for that reason, it cannot extinguish the detainee's Fourth Amendment claim . . . ." *Manuel*, 580 U.S. at 367.

The gist of Allen's "deprivation of liberty" claim, ECF No. 1 at 6–7, is that there was not, in fact, probable cause to detain him on the charge of intentionally pointing a firearm at law enforcement because Burns' claim that Allen pointed, or began to point, his firearm in Burns' direction was fabricated. "[F]alsifying the factual basis for a judicial probable-cause determination violates the Fourth Amendment." *Lewis*, 914 F.3d at 477. "Although the Seventh Circuit 'has not provided elements for a Fourth Amendment unlawful pretrial detention claim,' '[t]he consensus among district courts' is that a plaintiff must show that the defendants (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor." *Ree v. City of Chicago*, No. 22 CV 4284, 2023 U.S. Dist. LEXIS 73463, at *8–9 (N.D. Ill. Apr. 27, 2023) (quoting *Bahena v. Kennedy*, No. 17 CV 8532, 2021 U.S. Dist. LEXIS 258352, at *17–18 (N.D. Ill. Oct. 25, 2021)).

Defendants concede that the use of Burns' statement—that Allen pointed or began to point his firearm in Burns' direction—resulted in Allen being detained on the felony charge of intentionally pointing a firearm at law enforcement. ECF No. 29 at 14; ECF No. 26 at 16–17 (noting that Allen was handcuffed while hospitalized and made to pay a $15,000 bond to be released from Milwaukee County jail). It is also undisputed that Burns' statement that Allen pointed his firearm in Burns' direction was the sole basis for probable cause for that charge. ECF No. 26 at 17; ECF No. 30-3 at 139. Defendants also "concede that there was a favorable termination of the prosecution with the offense of Pointing a Firearm at a Law Enforcement Officer being dismissed." ECF No. 29 at 15.

The only question, therefore, is whether Burns falsified that statement, which requires a showing that the statement was "knowingly or recklessly false." *Washington*, 98 F.4th at 871. For purposes of this motion, the specific question is whether, viewing the evidence in the light most favorable to Plaintiffs, "the evidence is such that a reasonable jury could" find that Burns falsified the statement that Allen pointed his firearm in Burns' direction. *Anderson*, 477 U.S. at 248.

In light of the parties' agreement in their joint statement of facts that "[t]he muzzle of the gun was never pointed directly at . . . Burns," ECF No. 26 at 8, and Allen's testimony that his firearm remained pointed "towards the ground," ECF No. 30-2 at 53, a reasonable jury could conclude that Burns made a "knowingly or recklessly false" statement when he claimed after the shooting that Allen had begun to point his firearm in Burns' direction. *Washington*, 98 F.4th at 871.

This of course does not foreclose the possibility that a jury could question Allen's credibility and find that Burns genuinely interpreted Allen's actions that night as him raising his firearm to point it in Burns' direction. But, drawing all reasonable inferences in Plaintiffs' favor as the Court must at this stage, a reasonable jury could conclude that Burns knowingly or recklessly claimed that Allen raised his firearm in Burns' direction in order to justify Burns' own use of force against Allen. *See Gupta v. Melloh*, 19 F.4th 990, 1002 (7th Cir. 2021) ("We cannot determine whether Melloh violated Gupta's Fourth Amendment rights unless we know whether he falsified the evidence needed for the probable cause determination, and that, in turn, depends on resolution of a contested factual dispute . . . ."); *South v. Ill. EPA*, 495 F.3d 747, 751 (7th Cir. 2007) ("It is not [the court's] role [on summary judgment] to evaluate the weight of

the evidence, to judge the credibility of witnesses[,] or to determine the ultimate truth of the matter, but simply to determine whether there exists a genuine issue of triable fact." (citing *Anderson*, 477 U.S. at 249–50)).

Having so concluded, the Court next considers whether Burns is entitled to qualified immunity on this claim. He is not. "It has been clear since at least [1978] that falsifying the factual basis for a judicial probable-cause determination violates the Fourth Amendment." *Lewis*, 914 F.3d at 477 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)); *see also Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999) ("[A] reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." (citing *Albright*, 510 U.S. at 279 (Ginsburg, J., concurring))).

The Court lastly addresses the fact that, although their complaint references only Burns with respect to this claim, ECF No. 1 at 6–7, Plaintiffs' response in opposition attempts to extend the claim's application to Flores. ECF No. 32 at 10. Plaintiffs contend that "there is evidence [that] . . . Flores fabricated critical facts in the Probable Cause Affidavit," which stated that Burns observed Allen rack the slide of his firearm in the doorway and then began to raise it towards Burns, since Flores created the affidavit before having ever spoken with Burns. *Id.* The Court will reject Plaintiffs' attempt to expand the application of this claim. Plaintiffs cannot constructively amend their pleading in this fashion. *Colbert*, 851 F.3d at 656. In any event, there is no evidence that Flores fabricated those statements. Flores testified that, since he had not spoken with Burns at the time that he wrote the affidavit, the information must have "been provided to [him] by another detective who was assigned to . . . obtain that information, or [by] the

sergeant who collected all this information . . . ." ECF No. 30-3 at 18. While it is true that Defendants have been unable to determine who, specifically, conveyed that information to Flores, Plaintiffs can point to nothing in the record that would suggest that no one told Flores those things and he simply made them up.

For all these reasons, Defendants' motion for summary judgment as to this claim is denied, except to the extent that Plaintiffs attempted to expand the application of the claim to Flores.

### 4.4    Malicious Prosecution

The Court next addresses the motion for summary judgment as to Plaintiffs' claim that Burns caused Allen to be maliciously prosecuted. ECF No. 1 at 7. Defendants interpret this claim as arising under federal, rather than state, law. ECF No. 29 at 14–16. Plaintiffs do not object to that interpretation, ECF No. 32 at 10–11, so the Court will similarly assume that Plaintiffs' malicious prosecution claim is a federal one. *See Evans v. Matson,* No. 23-2954, 2024 U.S. App. LEXIS 11899, at *6 (7th Cir. May 16, 2024) ("The Supreme Court . . . has observed that its 'precedents recognize' what it called 'a Fourth Amendment claim under § 1983 for malicious prosecution.'" (quoting *Thompson v. Clark*, 596 U.S. 36, 42 (2022) and citing *Mitchell v. Doherty*, 37 F.4th 1277, 1284 n.3 (7th Cir. 2022))).

"Provided that the conduct results in the plaintiff's 'seizure,' the claim arises if a criminal prosecution (1) was instituted without probable cause; (2) for a 'malicious' motive—a purpose other than bringing the defendant to justice; and (3) 'ended without a conviction.'" *Id.* (quoting *Thompson*, 596 U.S. at 44, 49). "Even if a defendant did not personally detain or arrest the plaintiff, a malicious prosecution claim can lie where his or her actions cause the plaintiff to be seized without probable cause." *Coleman v.*

*Vang*, No. 21-cv-65-wmc, 2024 U.S. Dist. LEXIS 46496, at *29–30 (W.D. Wis. Mar. 15, 2024) (citing *Thompson*, 596 U.S. at 42–43). The elements of this claim overlap with that discussed *supra* Section 4.3. *Compare Evans*, 2024 U.S. App. LEXIS 11899, at *6 *with Ree*, 2023 U.S. Dist. LEXIS 73463, at *8–9.

That overlap prompts a question that the parties did not raise. Is this separately pleaded federal malicious prosecution claim essentially duplicative of Plaintiffs' previous claim, that Burns made false statements that caused Allen to be unreasonably seized pre-trial without probable cause in violation of the Fourth Amendment? *See supra* Section 4.3; *see also Smith v. City of Chicago*, No. 23-cv-05121, 2024 U.S. Dist. LEXIS 142799, at *4–6 (N.D. Ill. Aug. 12, 2024) (addressing the defendants' contention that the plaintiff's first two counts were duplicative where count one alleged an illegal seizure by detectives under § 1983 for causing the plaintiff to be "unlawfully detained prior to his criminal trial" and count two alleged malicious prosecution under § 1983 against the same defendants based on the same underlying facts and the same allegedly unreasonably seizure). The answer appears to be yes. Both claims here essentially allege that Allen was detained pre-trial without probable cause because Burns, motivated by an improper desire to justify his use of deadly force, made false statements about Allen's conduct. The claims essentially "seek the same relief based on the same law and facts against the same" defendant. *Smith*, 2024 U.S. Dist. LEXIS 142799, at *6.

The Supreme Court's comments in *Thompson* support this conclusion. 596 U.S. 36. In determining the elements of a malicious prosecution claim under the Fourth Amendment, it looked to "the most analogous tort"—common law malicious prosecution. 596 U.S. at 43. "That is because," the Court said, "the gravamen of the Fourth Amendment claim

for malicious prosecution . . . is the wrongful initiation of charges without probable cause. And the wrongful initiation of charges without probable cause is likewise the gravamen of the tort of malicious prosecution." *Id.* Indeed, the Court noted, "a Fourth Amendment claim under § 1983 for malicious prosecution[] [is] sometimes referred to as a claim for unreasonable seizure pursuant to legal process." *Id.* at 42.

Having concluded that this malicious prosecution claim is duplicative of Plaintiffs' unlawful pretrial detention claim, the Court declines to engage in any additional analysis as to this claim. Regardless of label, the claims are substantively the same—they rely on the same legal concepts, are based on the same underlying evidence and facts, and are brought against the same defendant. They will accordingly be treated as one moving forward. *See Smith,* 2024 U.S. Dist. LEXIS 142799, at *6 (dismissing the illegal pre-trial seizure claim as duplicative of the Fourth Amendment malicious prosecution claim and noting that "the terms 'illegal seizure,' 'unreasonable seizure,' and 'malicious prosecution' all refer[red] to the same violation" in that context); *see also Harless v. City of Columbus,* 183 F. Supp. 2d 1024, 1030 (S.D. Ohio 2002) ("[W]hen a plaintiff has a Fourth Amendment claim for an unreasonable seizure, he cannot separately assert a claim of malicious prosecution for a prosecution that arose out of that seizure.").[9]

_____

[9]Although the parties did not raise the issue, the Court further notes for purposes of thoroughness that the fact that there may have been probable cause to charge Allen with "Domestic Abuse: Act/Create Fear"), *see* ECF No. 30-23 at 1, does not categorically bar this Fourth Amendment claim as it relates to the charge of Pointing a Firearm at a Law Enforcement Officer. *Chiaverini v. City of Napoleon,* 602 U.S. 556, 558–59 (2024) ("The question presented here arises when the official brings multiple charges, only one of which lacks probable cause. Do the valid charges insulate the official from a Fourth Amendment malicious-prosecution

### 4.5    Conspiracy to Violate Plaintiffs' Civil Rights

Plaintiffs also proceed on a claim that Defendants conspired to violate Plaintiffs' constitutional rights. ECF No. 1 at 8–9. Plaintiffs' conspiracy claim appears to be at least partially premised on the contention that Flores deleted Ring camera footage of the shooting from Marqueta's phone. ECF No. 32 at 14. Defendants also seek summary judgment on this claim. ECF No. 29 at 16–19.

"To prevail on a conspiracy claim, 'the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights.'" *Daugherty v. Harrington*, 906 F.3d 606, 612 (7th Cir. 2018) (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015)). "Put differently, [the plaintiff] must 'show an underlying constitutional violation' and 'demonstrate that the defendants agreed to inflict the constitutional harm.'" *Id.* (quoting *Hurt v. Wise*, 880 F.3d 831, 842 (7th Cir. 2018)). "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Id.* (quoting *Beaman*, 776 F.3d at 511).

The Court will grant Defendants' motion for summary judgment as to this claim. The Court need not determine whether there is sufficient evidence in the record from which a jury could reasonably find that Flores deleted footage from the Ring app, because Plaintiffs in any event fail to

---

claim relating to the invalid charge? The answer is no: The valid charges do not create a categorical bar."). In any event, the State did not ultimately charge Allen with "Domestic Abuse: Act/Create Fear"; the criminal complaint set forth just a single charge of intentionally pointing a firearm at a law enforcement officer. ECF No. 30-24 at 1.

demonstrate that Flores and Burns ever made any sort of agreement to deprive Plaintiffs of their constitutional rights. *Daugherty*, 906 F.3d at 612 (quoting *Beaman*, 776 F.3d at 510). There is no evidence in the record suggesting that Flores and Burns interacted or communicated at all in the context of the events underlying this case. ECF No. 30-3 at 21 (Flores testifying in deposition that he knows Burns "from work" but that they have "never hung out outside"); *id.* at 10–11 (Flores testifying that in the period between his being assigned to the case and the officers' gathering to debrief and watch the body camera footage early in the morning on March 6, he never spoke to Burns); *id.* at 13 ("I don't think I interviewed . . . Burns . . . ."); *id.* at 18 ("I didn't speak with . . . Burns myself . . . ."); ECF No. 30-4 at 55 (Burns testifying at deposition that he did not recall if he ever spoke to "a detective Jose Flores" and that he did not recall who that was). *See Cooney v. Casady*, 746 F. Supp. 2d 973, 975–77 (N.D. Ill. 2010) (dismissing § 1983 conspiracy claim on summary judgment where there was "no evidence that the . . . defendants ever met or communicated with each other").

At bottom, the suggestion that Flores and Burns conspired together to violate Plaintiffs' constitutional rights is entirely speculative. The Court will accordingly order that Plaintiffs' § 1983 conspiracy claim be dismissed.

**5.     CONCLUSION**

For the reasons discussed herein, the Court will grant in part and deny in part Defendants' motion for summary judgment. Plaintiffs' claims that Burns used excessive force against Allen, that Flores unreasonably seized Marqueta, and that Burns' false statements caused Allen to be unreasonably detained/maliciously prosecuted will proceed to trial, with the exception of the seizure claim as to unnamed MPD officers detaining

Marqueta prior to Flores' first interview of her in the squad car. Plaintiffs' § 1983 conspiracy claim is dismissed. A trial scheduling order will issue contemporaneously with this Order.

Accordingly,

**IT IS ORDERED** that Defendants Jose Flores, Leon Burns, and City of Milwaukee's motion for summary judgment, ECF No. 28, be and the same is hereby **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that Plaintiffs Allen Dekeyser and Marqueta Dekeyser's Count III ("Fourth Amendment Claim for Deprivation of Liberty"), ECF No. 1 at 6, and Count IV ("Malicious Prosecution"), *id.* at 7, be and the same shall hereby be treated as one singular claim under the Fourth Amendment;

**IT IS FURTHER ORDERED** that Defendant City of Milwaukee be and the same is hereby **DISMISSED** from this action in light of Plaintiffs' voluntary dismissal of their *Monell* claim;

**IT IS FURTHER ORDERED** that Plaintiffs Allen Dekeyser and Marqueta Dekeyser's Count II ("Sec. 1983 Unlawful Detention"), ECF No. 1 at 6, be and the same is hereby **DISMISSED** only insofar as it pertains to unnamed MPD officers detaining Marqueta prior to her first interview with Flores; and

**IT IS FURTHER ORDERED** that Plaintiffs Allen Dekeyser and Marqueta Dekeyser's § 1983 conspiracy claim be and the same is hereby **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 15th day of May, 2025.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge